DARIO GARCIA & another[1] *vs.* KUSAN, INC., & others.[2]

No. 93-P-1414.

Plymouth. May 19, 1995. - October 19, 1995.

Present: ARMSTRONG, DREBEN, & JACOBS, JJ.

*Negligence*, Duty to warn, Manufacturer, Floor hockey equipment, Identity of manufacturer. *Warranty. Contract*, Misrepresentation.

In a civil action, liability for failure to warn, negligent misrepresentation, or breach of warranty could not be based on the defendants' dissemination of product literature or rules of a game (floor hockey) in the absence of evidence that the plaintiff's injury was caused by equipment made or supplied by a particular defendant or defendants. [326-329]

In a civil action, the plaintiff's materials in opposition to the defendants' motion for summary judgment did not demonstrate that the plaintiff had a reasonable expectation of proving that any specific defendant was the manufacturer of the hockey stick that caused his injuries; summary judgment was properly entered in favor of all the defendants. [329-331]

CIVIL ACTION commenced in the Superior Court Department on May 5, 1986.

The case was heard by *John A. Tierney*, J., on motions for summary judgment.

*Howard S. Ross* for the plaintiffs.

*Joseph P. Musacchio* for Cosom Corporation, Inc., & another.

*Carol A. Griffin* for Kusan, Inc.

DREBEN, J. On March 22, 1985, during a gym class at the Ashfield elementary school in Brockton, eleven year old Dario Garcia was struck in the eye with a hockey stick.[3] His

---

[1]Filipe Garcia Pina sued as next friend for his son Dario and individually for loss of consortium. Although we use the singular term "plaintiff," it will refer to both plaintiffs where applicable.

[2]Cosom Corporation, Inc., and ITT Corporation.

[3]Dario Garcia, in a deposition, explained that the accident occurred when one of the boys in his gym class picked up the stick, "way up in the

eye was permanently injured. He brought this action against the city of Brockton (city) and three corporate defendants, one or more of which had sold floor hockey equipment, referred to as "Cosom Hockey" or "Safe-T-Play" hockey, to the city.

The plaintiff's case against the corporate defendants did not rest on a defect in the hockey stick; rather, his claims were based on representations that "Cosom Hockey" could safely be played by children without the need for any eye protection. These representations, according to the plaintiff, render the defendants liable on theories of negligence (including a failure to warn), negligent misrepresentation, and breach of warranty.

The plaintiff settled his action against the city for $12,500. Prior thereto, a judge of the Superior Court had entered summary judgment in favor of the three corporate defendants. Ruling that the defendants as moving parties had submitted affirmative evidence negating "an essential element of Garcia's case, namely the identity of the manufacturer of the floor hockey stick which injured Garcia" and that Garcia had not produced any specific facts establishing the manufacturer's identity, the judge concluded that the plaintiff's negligence and breach of warranty claims failed as matter of law. He rejected Garcia's argument that because the game of "Cosom" indoor hockey was the defective product which caused Garcia's injury, the maker of the actual stick was irrelevant.

The plaintiff appeals, contending that there was sufficient evidence to show that a product manufactured and sold by the defendants, namely the game, caused Garcia's injury and, that in any event, there was a genuine issue of material fact as to whether his injury was caused by a hockey stick manufactured and furnished by the defendants. We affirm the judgment for each defendant because liability for failure to warn, negligent misrepresentation, or breach of warranty

---

air, like a baseball bat . . . above his shoulders." When he picked it up to hit the ball, it hit Garcia in the face. At that time, Garcia was standing behind the sideline, against the wall, waiting his turn to play.

may not be imposed in this case based on its dissemination of product literature or rules of the game in the absence of evidence that Garcia's injury was caused by any equipment made or supplied by that defendant.

1. *Corporate history relating to "Cosom" hockey sticks.* Three distinct corporations manufactured the Cosom line of floor hockey equipment prior to the 1985 accident: Cosom Corporation until May 14, 1970 (Cosom Corporation became a subsidiary of Thermotech Industries in 1963); ITT Corporation from May 14, 1970 (when ITT acquired the assets of Thermotech, including its Cosom operation and trade name "Cosom"), until July 26, 1976; and Kusan, Inc., after July 26, 1976, when it purchased the Cosom manufacturing division of ITT. In purchasing the assets of Thermotech, ITT agreed to assume all the liabilities of Cosom Corporation. Accordingly, ITT is responsible for any indoor hockey sticks sold by Cosom Corporation.

2. *Cosom Safe-T-Play hockey, its literature and equipment.* In his opposition to the defendants' motions for summary judgment, the plaintiff appended a Cosom Corporation pamphlet describing and touting Cosom Safe-T-Play products, together with what appears to be a separate booklet bearing a Cosom Safe-T-Play logo and the word Cosom at the bottom entitled:

"Hockey

"Official Rulebook for Indoor-Outdoor Play."

These materials were part of a marketing effort by Cosom Corporation to induce elementary schools to institute indoor floor hockey. As explained by Phillip Carlson, who had been involved in the original concept of floor hockey, Cosom Corporation started manufacturing plastic hockey equipment in 1961 at the suggestion of physical education teachers. Prior to that time, "there had been some floor hockey played, but it had been with wood sticks with some type of wrapping on them so that they didn't mar and scratch the floors. So, it became apparent that there would be a market for a — for a plastic stick that would be lighter, safer, and it could be used on gym floors without messing up the floors."

Cosom Corporation's pamphlet, which lists the "advantages of Cosom Hockey for schools and recreation departments," states that it is a simple game that anyone can learn quickly and is readily mastered by children as young as nine or ten years of age.[4] In large letters, the game is described as "Inexpensive. No Need for Protective Equipment"; in smaller letters the brochure states, "Thousands of the Indoor Hockey Kits are in use, throughout the country, and yet no case of serious injury has been reported." Under the heading "How Cosom Hockey Grew," the pamphlet includes a copy of a letter from Thomas Harter,[5] a Michigan director of civic recreation, originally published in Recreation Magazine in 1964. The letter enthusiastically endorses the sport of indoor hockey, sets forth the inexpensive cost and durability of the equipment — the Cosom Safe-T-Play Kit — and points out that the total cost of the game for a league of fifteen to twenty teams is the cost of one kit plus the cost of plastic face masks recommended for goalies.

The various products of Cosom are described at the end of the pamphlet. The kit referred to in Harter's letter, Safe-T-Play Hockey, "includes 12 regular Cosom Hockey sticks of Polyethylene, 36 and ½″ long and 6 ½ ounces, 3 Cosom Fun Balls and 3 pucks; 24 page instruction book." In addition to the kits, other products offered for sale included sets of hockey sticks and sets of pucks, each set available separately.

The marketing materials discussed above were promulgated by Cosom Corporation in the late 1960's and early

---

[4]Another publication prepared by an organization known as the "Athletic Institute," but bearing Cosom's name, describes floor hockey as follows: "It's really ice hockey without ice. Instead of skates, the players wear sneakers or rubber soled running shoes, and, instead of an India-rubber puck you substitute a light-weight plastic disc or ball."

[5]The official rule book put out by Cosom states that the first indoor hockey games introduced under an organized recreation program were in Battle Creek, Michigan, and that the program "was developed and instigated by Tom Harter . . . who devised the simple rules of the game." The plaintiff repeatedly claims that the game was invented by Cosom. Passing the questions whether the game was a new creation and, if so, who was its inventor, we assume, in the plaintiff's favor, that the game, or its rules, is what was sold.

1970's, prior to Kusan's purchase of Cosom. The record does not contain any marketing materials of Kusan stating that protective equipment is unnecessary. Indeed, deposition testimony of Phillip Càrlson (who stayed with Cosom through all its corporate restructurings) indicates that beginning at least in 1981, Kusan recommended that all players wear protective eyewear.

3. *Purchases by the city and identification of the hockey stick.* Hockey equipment for the Brockton schools was purchased through a bidding process, and the city purchased hockey equipment from several different manufacturers.[6] Once equipment was received, it went to a central repository, and from there it was distributed to one or more of the city's twenty-three elementary schools. There was no way of telling which sticks were purchased at what time.

After the accident, the stick that struck Garcia was commingled with the other sticks used during the gym period. Later that day, James Lazour, the director of physical education for the Brockton schools, went to the Ashfield school's equipment room and "randomly" selected one stick (exhibit 6) from a pile of sticks that had been in use in Garcia's gym class. His "best belief" was that "only Cosom hockey sticks were in use in that class" on the day of the accident. The basis for his answer was "[t]he fact that those were the first hockey sticks we purchased." Lazour did not know who manufactured either the particular Cosom stick that hit Garcia or the stick labeled exhibit 6 or when either of them had been manufactured. An interrogatory addressed to the city and answered by Garcia's physical education teacher stated that the company from which the equipment had been purchased was "Cosom Company."

4. *The plaintiff's theory that the game, not the stick, is the product.* The plaintiff's main contention is that by inventing the game "Safe-T-Play" indoor hockey (see note 5, *supra*) and promulgating the instructions for its use, includ-

---

[6]In addition to purchasing hockey sticks from the three defendants, the city also bought floor hockey sticks from other companies, particularly, Cooper, Inc., and Sportscraft, Inc.

ing the express representations that the game was safe for children and no protective equipment was needed, the defendants are liable for breach of express and implied warranties. Moreover, he argues that they are also liable under negligence principles because the representations were made notwithstanding the defendants' recognition, through Phillip Carlson (who was employed by Cosom Corporation and both of its successors) that eye injuries had occurred.

Even assuming in the plaintiff's favor that the game — the concept and instructions — was the "product" which was sold (see note 5, *supra*), there is no legal support for imposing liability on such a "product" where the seller does not provide a tangible item as well as instructions. An analogy may be drawn to the cases refusing to extend to an author or publisher of a book the duty imposed on suppliers of other products to provide complete and accurate information on their use.

The discussion in *Winter* v. *G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991), is particularly instructive. The plaintiffs in that case purchased a book entitled "The Encyclopedia of Mushrooms" to help them collect, cook, and consume wild mushrooms. After relying on the descriptions in the book in determining which mushrooms were safe to eat, they became critically ill. In their action against the publisher (distributor), the plaintiffs sought damages on theories similar to those Garcia alleges here. In upholding the grant of summary judgment for the defendant, the court cited to the almost unanimous judicial authority against the plaintiffs' assertions of liability, explaining that product liability law is geared to the tangible world and is unsuited to words and ideas. "Under products liability law, strict liability is imposed on the theory that '[t]he costs of damaging events due to defectively dangerous products can best be borne by the enterprisers who make and sell these products.' " *Id.* at 1034-1035, quoting from Prosser & Keeton, The Law of Torts § 98, at 692-693 (5th ed. 1984). Noting that even when applied to tangible products, strict liability principles are not without social costs as they may inhibit innovation, the court

emphasized that such losses are "much less disturbing than the prospect that we might be deprived of the latest ideas and theories." *Id.* at 1035. For similar reasons and "the gentle tug of the First Amendment," *id.* at 1037, the court declined to impose a duty on the defendant to investigate the accuracy of the contents of the book or to warn that the information may not be complete. Thus, the court also refused to extend liability under negligence theory to the ideas and expression in a book. *Id.* at 1036-1037.

In rejecting a theory of negligent misrepresentation against a publisher, another court pointed out: "One who publishes a text cannot be said to assume liability for all 'misstatements,' said or unsaid, to a potentially unlimited public for a potentially unlimited period." *Roman* v. *City of N.Y.*, 110 Misc. 2d 799, 802 (N.Y. 1981). See also *Herceg* v. *Hustler Magazine, Inc.*, 565 F. Supp. 802 (S.D. Tex. 1983); *Barden* v. *Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 45 (D. Mass. 1994); *Cardozo* v. *True*, 342 So. 2d 1053 (Fla. Dist. Ct. App. 1977); *Birmingham* v. *Fodor's Travel Publications, Inc.*, 73 Haw. 359 (1992), as well as cases cited in *Winter* v. *G.P. Putnam's Sons*, 938 F.2d at 1036 & 1037, nn. 6 & 8.

The same reasoning applies to games. See *Watters* v. *TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990), involving a parlor game, Dungeons and Dragons, where the court noted that "the doctrine of strict liability has never been extended to words or pictures." *Id.* at 381. For views of commentators, compare Hoffman, From Random House to Mickey Mouse: Liability for Negligent Publishing and Broadcasting, 21 Tort & Ins. L.J. 65 (1986), taking a position similar to *Winter* v. *G.P. Putnam's Sons, supra*, with McDermott, Liability for Negligent Dissemination of Product Information: A Proposal for Assuring a More Responsible Writership, 18 Forum 557 (1983), and Mintz, Strict Liability for Commercial Intellect, 41 Cath. U. L.R. 617 (1992), both authors arguing for liability.

We conclude that the plaintiff cannot recover on the basis that the game (the concept and instructions) is the product

either on strict liability or warranty principles, see Restatement (Second) of Torts § 402A (1965) (product); see also G. L. c. 106, §§ 2-102, 2-105 (goods), or on theories of negligence. In the absence of special circumstances, he may not recover for instructions and representations concerning the use of other manufacturers' equipment and may only recover if he can establish that some item traced to a specific defendant caused his injury. *Mitchell* v. *Sky Climber, Inc.*, 396 Mass. 629, 631 (1986). *Mathers* v. *Midland-Ross Corp.*, 403 Mass. 688, 691 (1989). *Carrier* v. *Riddell, Inc.*, 721 F.2d 867, 869-870 (1st Cir. 1983).

5. *Identity of the manufacturer.* The case of *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), instructs that:

> "a party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."

On the assumption that the plaintiff can overcome other hurdles,[7] the question remains whether the plaintiff's materials support the conclusion that he has a reasonable expectation of proving that a specific defendant was the manufacturer of the hockey stick that caused his injuries. It will be

---

[7]The obvious danger of a hockey stick being misused and the fact that only one defendant appears to have made representations as to the safety of the game might also pose problems to the plaintiff. See cases holding that where danger is obvious, manufacturer need not warn, e.g., *Killeen* v. *Harmon Grain Prod., Inc.*, 11 Mass. App. Ct. 20 (1980) (flavored toothpick pierced child's lip when she fell from jungle gym); *Atkins* v. *Arlans Dept. Store of Norman, Inc.*, 522 P.2d 1020 (Okla. 1974) (lawn dart thrown vertically, contrary to rules of the game).

We note that the hockey rules issued by Cosom Corporation specifically prohibited raising the hockey stick above waist level. Here the stick was raised above the player's shoulders. See note 3, *supra*.

remembered, see part 3, *supra*, that Lazour said it was his "best belief" that only Cosom hockey sticks were in use in Garcia's class, and Garcia's gym teacher, in an answer to an interrogatory directed to the city, stated that the hockey equipment had been purchased from "Cosom Company." At the end of his answers to the interrogatories, the gym teacher made the following statement: "The foregoing interrogatories are based not necessarily upon my own personal knowledge but after inquiry of my fellow employees and defense counsel of the City of Brockton." In a deposition, the same gym teacher explained that he had been instructed by Lazour that the participants were using Cosom hockey sets. Thus, the plaintiff's showing rested entirely on Lazour's "best belief."

The judge, in acting on the motions for summary judgment, "did not have to accept an assertion of belief as an assertion of the truth of the fact believed." *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976). See *Key Capital Corp.* v. *M&S Liquidating Corp.*, 27 Mass. App. Ct. 721, 727-728 (1989). Entitled to ignore "evidence" asserted as "belief," the judge, based on the undisputed fact that the city had purchased floor hockey sticks manufactured by companies such as Cooper, Inc., and Sportscraft, Inc. (see note 6, *supra*), properly concluded that the plaintiff had failed to meet the requirements of *Kourouvacilis*, *supra*. Moreover, even if Lazour's testimony is deemed sufficient to show that all the sticks used in the gym class were Cosom Sticks, Garcia cannot prove which corporate entity, Kusan or ITT,[8] both of which were involved in the manufacture of Cosom equipment in the years preceding Garcia's accident, made the stick that caused him injury. See *Guzman* v. *MRM/Elgin*, 409 Mass. 563, 566 (1991); *McCarthy* v. *Litton Indus., Inc.*, 410 Mass. 15, 21 (1991), cases indicating that Kusan has no liability as a successor corporation under the product line theory. In the absence of identification of the

---

[8]As noted earlier, ITT is also responsible for hockey sticks manufactured by Cosom Corporation.

manufacturer, the judgment for the defendants must be affirmed.

*So ordered.*