William COONS and Melissa Coons, Individually and as P.P.A. of Peter Coons and Nevaeh Coons, Minor Children, Plaintiffs,

v.

A.F. CHAPMAN CORP., and John Doe, Defendants and Third Party Plaintiff,

v.

Industrial Knife Company, Inc., Third Party Defendant and Fourth Party Plaintiff,

v.

Heritage Knife Company, Fourth Party Defendant.

Civil Action No. 03–11900–MBB.

United States District Court, D. Massachusetts.

Oct. 18, 2006.

Gregory A. Carrara, Darrell Dayian, Carrara Dayian PC, Providence, RI, Thomas J. Hunt, Thomas J. Hunt & Associates, New Bedford, MA, for Fourth Party Defendant.

Brian M. Cullen, J. Terrance Gillan, Law Offices of Thomas M. Niarchos, Boston, MA, for Defendants and Third Party Plaintiff.

Amato Anthony DeLuca, Michael T. Eskey, DeLuca & Weizenbaum, Ltd., Providence, RI, for Plaintiffs.

Todd Gordon, Peter J. Haley, Gordon Haley LLP, Boston, MA, for Third Party Defendant and Fourth Party Plaintiff.

## MEMORANDUM AND ORDER RE: DEFENDANT A.F. CHAPMAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 60); DEFENDANT HERITAGE KNIFE COMPANY'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 63); INDUSTRIAL KNIFE COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 66)

BOWLER, United States Magistrate Judge.

Pending before this court are the above styled summary judgment motions in this personal injury action involving an injury to plaintiff William Coons' left hand at his place of employment, Retail Printing Corporation ("Retail"), in Taunton, Massachusetts. Plaintiff William Coons ("Coons") seeks recovery for negligence, breach of warranty and product liability from defendant and third party plaintiff A.F. Chapman Corporation ("Chapman"), defendant John Doe Company, third party defendant and fourth party plaintiff Industrial Knife Company, Inc. ("Industrial") and fourth party defendant Heritage Knife Company ("Heritage").

In separate third party complaints, Chapman seeks contribution and indemnity from Industrial and Industrial seeks contribution and indemnity from Heritage. Heritage, in turn, filed a cross claim against Chapman for contribution and indemnity.

Chapman, Industrial and Heritage move for summary judgment on the negligence, breach of warranty and product liability claims asserted by Coons. Industrial additionally moves for summary judgment against Chapman on the indemnification claims in Chapman's third party complaint. Finally, Chapman and Heritage request dismissal of the loss of consortium claims brought by plaintiffs Peter and Nevaeh Coons, Coons' two minor children, and Melissa Coons, Coons' wife. Having conducted a hearing and taken the motions under advisement, the motions (Docket Entry # # 60, 63 & 66) are ripe for review.

### STANDARD OF REVIEW

"Summary judgment is appropriate when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Federal Refinance Co., Inc. v. Klock,* 352 F.3d 16, 30 (1st Cir.2003) (quoting Rule 56). A "genuine" issue means "'that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Velez–Rivera v. Agosto–Alicea,* 437 F.3d 145, 150 (1st Cir.2006). A "fact is 'material' if it is 'one that might affect the outcome of the suit under the governing law.'" *Id.* Each

summary judgment motion is reviewed separately and factual disputes are resolved in favor of the nonmoving party. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.*, 119 F.3d 55, 56 (1st Cir.1997); *Wightman v. Springfield Terminal Railway Co.*, 100 F.3d 228, 230 (1st Cir.1996) ("cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se").

The moving party bears the initial burden of informing the "court of the basis for the motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). "As to issues on which the summary judgment target bears the ultimate burden of proof, she [or he] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995); *accord DeNovellis v. Shalala*, 124 F.3d at 306.

"Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." LR. 56.1; *see also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 12 (1st Cir.2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); *Stonkus v. City of Brockton School Dept.*, 322 F.3d 97, 102 (1st Cir.2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the plaintiff failed to controvert).

Viewed in Coons' favor as the nonmoving party, the summary judgment record is as follows. Citations to the record are provided only for direct quotes.

## FACTUAL BACKGROUND

Born in 1963, Coons, a resident of Lakeville, Massachusetts, began working in the printing industry in 1986 at South Shore Publishing Company ("South Shore"). He began as a stacker stacking finished product and then as a roll tender keeping the presses fed with rolls of paper. Thereafter, he worked as an assistant pressman responsible for setting the ink and color and then as a pressman with responsibilities including changing knives.

Coons first changed knives on presses manufactured by the Harris Corporation ("Harris") and thereafter on presses manufactured by Goss International Corporation ("Goss"). He has a press manual for a Harris press but lacks a manual for Goss machinery.

Cutting and folding machines attach to each press in order to cut and fold the paper. The cutter and folder contains one or more knife boxes. A knife box, in turn, consists of "two pieces of metal bolted together with a knife blade sandwiched in between" the metal pieces. (Docket Entry # 63, Ex. 2, p. 24).

With respect to a Harris press and a Harris cutter and folder, the pressman takes the knife box out of the folder and places the box on a table. He then loosens certain bolts and lifts up half of the box to expose the knife. When Coons first learned the process, the knife consisted of four segmented blades five inches long and two to three inches wide. The pressman removed the four separate blades from the "one uni-blade" by picking each up from the non-blade side. After removing the old knife blade, the pressman placed the new knife inside and then put back the removed half box and bolted the two halves back together.

Coons first worked on the Goss C700 press at Treasure Chest, a company that had acquired South Shore, for "maybe a

year" before leaving his job as a pressman at Treasure Chest in 1992 and starting work as a supervisor at Retail. (Docket Entry # 63, Ex. 2, pp. 19 & 36). Like Retail, Treasure Chest was in the commercial printing business. During the time at Treasure Chest, Coons' duties included changing knives on the Goss C700 cutter and folder which at the time had segmented knife blades.[1] When Coons began working on the Goss C700 press and the cutter and folder at Treasure Chest, he received informal training consisting of "a brief discussion about the folder and how it operated." (Docket Entry # 63, Ex. 2, pp. 20–21).

Changing the knife blades in a knife box on the Goss C700 press with a Goss C700 cutter and folder at Treasure Chest differed from the process used on a Harris press. The box itself was not taken apart and separated into halves but instead the end was removed after loosening the bolts holding the box together. The pressman then "would slide out the wooden cheekwoods" leaving the knife exposed. (Docket Entry # 63, Ex. 2, p. 43). After opening or loosening the box, the pressman removed the segmented knife blades with his hands or a pair of pliers. Coons more often than not used a pair of pliers as opposed to his hands and, up until the accident, had never cut himself during the process. After removing the used blade, Coons oftentimes picked up the sheathed blade with his hands and dropped it into place. Before locking up and reassembling the box, Coons would remove the sheath.

An alternative and quicker method is to replace the knife box with "a knife box that [is] not in use." (Docket Entry # 63, Ex. 2, p. 25). This method does not shut down the press for as long a time thereby saving valuable production time. It consists of stopping the press, removing the knife box, replacing it with a newly rebuilt knife box and "chang[ing] the cutter rubbers." (Docket Entry # 63, Ex. 2, p. 61).

The knife changing procedures were the same "for the most part" at both Treasure Chest and Retail. (Docket Entry # 63, Ex. 2, p. 47). At Retail, Coons was responsible for supervising four press crews during each twelve hour shift. In 1992, the company had two Harris presses and two Goss C500 presses. Changing the knife box on a Goss C500 press was similar to the process of removing the two halves of a knife box on a Harris press, replacing the worn blade and bolting the two halves back together. (Docket Entry # 63, Ex. 2, p. 48). As to the segmented blades, they were the same for the Goss C500 press and the Goss C700 press. The 20 inch blade consisted of "four or five inch segments." *Id.*

During Coons' employ prior to the accident, Retail acquired four Goss C700 presses.[2] Although the first Goss C700 press acquired in 1994 used segmented blades in the knife box, Retail later changed to using one piece knives in all eight of the presses at the Taunton plant. The single blade used in a knife box for the Goss C700 cutter and folder was 20 inches long and approximately three inches wide with angled serrated teeth. The knives used in the Harris machines were 20 inches in length and "maybe two" or "two and a half" inches in width with straight, as opposed to angled, serrated teeth. (Docket Entry # 63, Ex. 2, p. 53).

Retail kept the replacement knife blades for the eight presses in plastic bins on a

---

**1.** At the time of the accident, Coons was working with a Goss C700 cutter and folder.

**2.** The above evidence, taken from Coons' deposition, differs from evidence in Shawn Thomas Gill's deposition that Retail had six Goss presses in September 2000.

metal shelf "in the general vicinity by the supervisor's office." (Docket Entry # 63, Ex. 2, pp. 56–57). Knives were restocked by placing the new knives on the top of the bin as opposed to the bottom. One bin had "the name Chapman and the part number, C700," written in black magic marker. (Docket Entry # 63, Ex. 2, pp. 123 & 189). All of these knives had black plastic guards, also referred to as sheaths. During 1999, Retail only purchased C700 knives from Chapman and, of all the suppliers Retail used at the time, Chapman was the only supplier that used black plastic guards for its knives. The knives themselves, however, were generic in nature with no identifying marks on the knife or the sheath.

Retail's 1998 purchases of C700 cutoff knives from Chapman totaled 170 knives. In 1999, Retail purchased 160 C700 cutoff knives from Chapman with the last purchase of 50 knives occurring on September 13, 1999.[3] From September 1999 to the time of the accident, Retail did not purchase C700 cutoff knives from another vendor or from Chapman.[4] Retail replenished the supply from a safety stock in a cabinet and reordered when supplies ran low. It would also occasionally obtain and use sample blades from other manufacturers.

The foregoing figures reflect a monthly average use of 13 to 15 C700 cutoff knives purchased from Chapman during 1998 and 1999. Given that rate of consumption, Retail's "last purchase of 50 C–700 blades in September 1999 would have been used up . . . by the end of 1999." (Kish Affidavit, No Docket Entry No. Assigned).

On the other hand, Coons plausibly avers, based inter alia on his knowledge and observations of the printing operations at Retail, that the company consumed no more that an average of eight C700 cutoff knives purchased from Chapman each month. Using the foregoing 1998 and 1999 annual purchases, Retail therefore had a surplus of 138 knives in September 1999. At the eight knives per month rate, Retail would have fully depleted this surplus months after September 2000. Retail did not resume purchasing C700 cutoff knives from Chapman until June 2001 albeit purchasing a knife with finer cutting teeth. Thus, although contrary evidence in the record exists,[5] a reasonable finder of fact could conclude that the bin labeled Chapman C700 still contained these knives in September 2000 notwithstanding the possibility that Retail purchased these generic knives from another vendor after suspending its purchases from Chapman in September 1999.

---

**3.** The figure of 50 knives as well as the other figures of monthly knife purchases from Chapman compiled by Chapman's senior sales representative do not include any figure divisible by 12. Chapman, however, shipped the C700 knives to Retail in one or more packages of 12, according to Coons. (Docket Entry # 63, Ex. 2, p. 58; Docket Entry # 61, ¶ 10). On the other hand, Industrial's Rule 30(b)(6) witness testified that Heritage shipped knives in groups containing "anywhere" from "five to ten pieces." (Docket Entry # 73, Ex. 5, p. 27).

**4.** The record in this respect is disputed. Although there is significant evidence that Retail ran out of C700 cutoff knives prior to the

September 2000 accident and obtained C700 knives from other vendors after September 1999 and prior to September 2000, this court is obligated to view the record in Coons' favor. In so doing, a reasonable fact finder could resolve the issue in Coons' favor.

**5.** For example, Retail may have been procuring knives for the Goss C700 cutter and folder from a distributor known as Nensco. Evidence in the record also includes testimony that Retail changed knife blades every three to five weeks on the Goss presses. Moreover, there was nothing on the Chapman C700 cutoff knife or its protective guard that identified Chapman as the manufacturer.

On September 29, 2000, Coons arrived at 7:00 a.m. for a 12 hour shift. Shortly after his arrival, he learned that two Harris presses which were joined as one had cutting problems and he observed a "raggy cut." (Docket Entry # 63, Ex. 2, pp. 76–77). Although the presses were Harris models, they were using a Goss C700 cutter and folder. Coons determined that two blades needed changing in the single folder containing the two knife boxes. In order to minimize the amount of lost production time with the presses shut down, Coons decided to rebuild two spare knife boxes instead of rebuilding the knife boxes in use. Accordingly, Coons retrieved two C700 knives with his hands from the box labeled "Chapman C700." The cutoff knives had black plastic sheaths on the blades to protect the handler.[6] He also retrieved two used Goss C700 knife boxes, new wood and additional supplies including a pair of pliers and brought the items to a table.

On the table, Coons proceeded to loosen and remove the underneath bolts and the bolt on one side. After sliding the old wood out, he removed the old blade and put the new C700 blade in the box. When he went to put the bolts back on the box, he noticed that the C700 blade was not in the proper position. He then took his left hand over the sheathed C700 blade and the top of the box. With a screwdriver against the C700 blade with the black plastic guard in his right hand, Coons pushed the C700 blade with the screwdriver. Unfortunately, his right hand slipped and hit the knife box and his left hand "slipped onto the blade."[7] (Docket Entry # 63, Ex. 2, p. 83). Coons' left hand pushed through the black protective guard and the

C700 blade sunk into the palm of his left hand.

Shortly after the accident, a Retail Vice President handed the black plastic guard that was over the C700 blade that injured Coons' hand to Arnold Silvia ("Silvia"), Retail's Safety Manager. Silvia observed that the protective sheath or guard was split on one edge and "cracked all on one side." (Docket Entry # 73, Ex. H, p. 56). The solid black plastic guard did not have identifying marks, serial numbers, labeling or warnings of any kind. Describing the guard as one quarter inch thick, Silvia also noticed that it was dry and "very brittle." (Docket Entry # 73, Ex. H, p. 55).

After the accident, Silvia placed the guard on a shelf in his office and kept it there "for months." (Docket Entry # 63, Ex. 8, p. 64). Silvia lost track of the guard when he moved to a smaller office in early 2002. Silvia does not know what company supplied the knife to Retail. Similarly, Shawn Thomas Gill, a Retail employee at the time with purchasing responsibilities (Docket Entry # 73, Ex. 7, pp. 103–105), does not know what company manufactured the knife or the guard.

As indicated above, the record supports a finding that Retail purchased the C700 knife with the black plastic guard at issue from Chapman. Although Chapman manufactured a number of knives at the time, it did not manufacture the C700 knife with the protective sheath that Chapman sold to Retail. Rather, Chapman obtained the C700 cutoff knives with the protective sheaths that it sold to Retail in 1998 and 1999 from Industrial. Industrial was the only vendor Chapman used for the C700 cutoff knives in 1999 and 2000. Industrial is not a knife manufacturer. Instead, it

---

**6.** The record is disputed as to the purpose of the sheath. This court, however, is obligated to view the record in Coons' favor.

**7.** Coons' answer to an interrogatory depicts a similar scenario of losing his balance when "the wrench slipped off the knife." (Docket Entry # 68, Ex. 7, No. 4).

acquired knives from other vendors and sold them to customers such as Chapman in the 1999 and 2000 time period. Heritage was Industrial's only vendor for the C700 knives during this time period. Having received the C700 cutoff knives with the protective guard from Heritage, Industrial then "drop shipped" the knives directly to Retail using Chapman labels provided by Chapman.

Heritage began selling the C700 cutoff knives to Industrial in 1995. At first, Heritage shipped the knives without protective guards. In 1997 and at Industrial's request, Heritage began shipping the C700 cutoff knives with a guard to protect the teeth during shipping. After researching various guards or sheaths, Heritage settled upon a black plastic guard obtained from C–Line Products, Inc. ("C–Line"). C–Line would then cut the guard to a length specified by Heritage. C–Line manufactures plastic storage, identification and organizational items such as report covers for the office products industry. After choosing the C–Line product, Heritage shipped it to Industrial for approval in order "to see if it was suitable for what [Industrial] requested." (Docket Entry # 73, Ex. F, p. 38). Thereafter, Heritage began shipping all of the C700 cutoff knives to Industrial with the black plastic protective guards. Industrial's Vice President attests that the "black sheath is used to protect the knife and packaging during shipment." (Docket Entry # 68, Ex. 2). Heritage has never received a complaint about "the quality of the shipping cover." (Docket Entry # 68, Ex. 5, p. 148).

When Heritage receives the black plastic protective guards from C–Line, Heritage trims the guards "to whatever length the knife is" (Docket Entry # 73, Ex. G, p. 59) and then ships the C700 cutoff knives with the protective guards to Industrial. Industrial receives the C700 cutoff knife with the black plastic protective guards and, without making any alterations to the product, sends them directly to Retail with the Chapman label provided by Chapman.

## I. *DEFENDANT A.F. CHAPMAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 60)*

In moving for summary judgment, Chapman posits two theories. First, it asserts there is an absence of evidence that it manufactured, distributed or sold the knife or sheath that injured Coons. Second, Chapman argues that it owed no duty to place a heavy guard on the C700 knife.

■ Turning to the first argument, "Identification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action." *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 181 (1982). Likewise, "[a] plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer." *Mathers v. Midland–Ross Corp.*, 403 Mass. 688, 532 N.E.2d 46, 49 (1989). A similar requirement adheres to a breach of warranty claim. *See, e.g., Garcia v. Kusan, Inc.*, 39 Mass.App.Ct. 322, 655 N.E.2d 1290, 1291 & 1294 (1995) (affirming summary judgment on breach of warranty and negligence claims given the plaintiff's failure to identify manufacturer of hockey stick); *accord Spencer v. Baxter International, Inc.*, 163 F.Supp.2d 74, 77 (D.Mass. 2001) (recognizing causation as essential element in breach of warranty claim and stating that the plaintiff "generally must identify the specific defendant responsible for an actionable harm"). Moreover, in breach of warranty claims, the plaintiff must also "show that the product was in a defective condition when it left the defen-

dant's possession." *Makuc v. American Honda Motor Co., Inc.,* 835 F.2d 389, 392–393 (1st Cir.1987) (citing *Walsh v. Atamian Motors, Inc.,* 10 Mass.App.Ct. 828, 406 N.E.2d 733, 734 (1980)).

The evidence connecting Chapman to the black plastic protective guard over the C700 cutoff knife is not overwhelming. The guard and knife are missing and, in any event, lacked any identifying marks. As generic products manufactured, distributed and sold by any number of entities, Coons faces an uphill battle to convince a jury of the seller's identity. Notably, the last sale of a C700 knife with a black plastic guard from Chapman occurred one year before the accident.

█ Nonetheless, a reasonable jury could resolve the issue in Coons' favor. In particular and taking into consideration the foregoing evidence, a reasonable jury could find that in 1999 Retail only purchased C700 cutoff knives from Chapman and, of all the suppliers Retail used at the time, only Chapman used black as the color of the guards for its knives. Coons retrieved the generic C700 knife from the bin labeled Chapman C700. As explained in the factual background, a reasonable jury could find that the bin labeled Chapman C700 still contained and only contained at the time of the accident C700 knives purchased from Chapman.[8] Summary judgment is therefore improper based on the argument that Coons cannot establish that Chapman sold the C700 knife and black plastic guard that injured Coons.

█ Turning to the alleged lack of duty, Chapman maintains that Coons cannot establish that Chapman had a duty to place a heavy duty cover on the C700 knives and that duty is required in a negligence action. The latter statement is undoubtedly true. To succeed on a negli-

gence claim, "the plaintiff must satisfy the elements of duty, breach, causation and damages." *Coughlin v. Titus & Bean Graphics, Inc.,* 54 Mass.App.Ct. 633, 767 N.E.2d 106, 110–111 (2002). Absent a duty of care, there can be no liability for negligence. *See Remy v. MacDonald,* 440 Mass. 675, 801 N.E.2d 260, 262 (2004); *accord Coughlin v. Titus & Bean Graphics, Inc.,* 767 N.E.2d at 111 ("person is not negligent toward another unless he owes the other a duty to be careful"). Unlike warranty liability, "the focus of the negligence inquiry is on the conduct of the defendant." *Colter v. Barber–Greene Co.,* 403 Mass. 50, 525 N.E.2d 1305, 1313 (1988). Liability thereby enures "when a product's manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." *Id.* A negligence finding "signifies that the product was unreasonably dangerous because of its design or because of its failure to be accompanied by an adequate warning, or both." *Id.*

Contrary to Chapman's position, however, a jury could reasonably find there was a foreseeable danger that users would view the guard as a guard to protect them during use. The foreseeable danger that users would view the guard as a guard during use would thereby subject the users to an unreasonable risk of injury. This remains true even given the absence of a governmental requirement or industry standard requiring protective sheaths or guards. Furthermore, the black plastic guard failed to contain an adequate warning or information about the functional limitations of the guard, to wit, that it would not protect a user during the foreseeable use of knife changing against injury from the underlying blade. A reasonable jury could find that an ordinarily

---

8. In making this finding, this court is not relying on hearsay evidence.

prudent seller as well as manufacturer "would have recognized the product's shortcomings and would have taken appropriate corrective measures," *Id.*, such as placing a warning on the guard or, alternatively with respect to a design defect, not putting a guard on at all or putting a guard on that was sufficient to withstand the foreseeable use and risk of injury.

■ As a final argument, Chapman maintains, and Coons agrees, that the loss of parental consortium claims proffered by Peter and Nevaeh Coons fail because these children were born after the accident. Although Massachusetts law recognizes a cause of action for loss of parental society, it does not extend the cause of action to children born after the accrual of the parent's action. *See Angelini v. OMD Corporation*, 410 Mass. 653, 575 N.E.2d 41, 43 & 45 (1991).

In light of the foregoing, Chapman is not entitled to summary judgment except for the loss of parental consortium claims brought by Coons' minor children.

## II. *DEFENDANT HERITAGE KNIFE COMPANY'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 63)*

Heritage initially argues that causation is absent on both the negligence and breach of warranty claims and, in the context of product liability, the plaintiff must affirmatively identify the manufacturer of the injurious product. Contrary to Heritage's assertions, however, there is sufficient evidence that Coons' injuries were caused by Heritage's product.

Viewing the record in Coons' favor, a reasonable jury could find that Heritage was Industrial's only manufacturer of the C700 knives during the relevant time period prior to the accident. At Industrial's behest, Heritage investigated and procured the black plastic guards from C–

Line to protect the blades during shipping. Using a Chapman label, Industrial then drop shipped the C700 knives with the guards directly to Retail. In 1999 and 2000, Chapman purchased all of its C700 knives from Industrial. As previously discussed, the record supports a finding that Retail purchased the C700 knife with the black plastic guard from Chapman.

■ Accordingly, although causation is an essential element of the negligence and breach of warranty claims against Heritage, there is sufficient evidence " 'from which a reasonable jury may conclude that it is more probable that the event was caused by [Heritage] than that it was not.' " *Spencer v. Baxter International, Inc.*, 163 F.Supp.2d at 78 (internal brackets omitted). There is also enough evidence for a reasonable jury to trace the C700 knife and protective guard that caused Coons' injuries back to Heritage. *See generally Mathers v. Midland–Ross Co.*, 532 N.E.2d at 49. Thus, even though Heritage presents a forceful argument, a reasonable jury could find that Heritage manufactured the C700 knife with the protective guard that injured Coons. *See generally Garcia v. Kusan, Inc.*, 655 N.E.2d at 1294.

■ Heritage next posits in the context of the breach of warranty and negligence claims that the C700 knife at issue is only a component part of the larger press and that a manufacturer such as itself had no duty to warn of latent dangers arising from the fully assembled press. "When a component of an integrated product is not itself defective, the maker of the component is not liable for injury that results from a defect in the integrated product." *Cipollone v. Yale Industrial Products, Inc.*, 202 F.3d 376, 379 (1st Cir.2000). "[T]he prevailing view" in Massachusetts and elsewhere "is that a supplier of a component part containing no latent defect has

no duty to warn the subsequent assembler or its customers of any danger that may arise after the components are assembled." *Mitchell v. Sky Climber, Inc.*, 396 Mass. 629, 487 N.E.2d 1374, 1376 (1986); *Cipollone v. Yale Industrial Products, Inc.*, 202 F.3d at 379 (quoting *Mitchell* in parenthetical).

At the time it left Heritage's control, however, the component part, assuming arguendo that the protective guard was such a part with respect to the Goss C700 cutter and folder, posed a foreseeable danger of subjecting users such as Coons to an unreasonable risk of injury. Heritage's component part argument falters because, as previously explained, a reasonable jury could find that the C700 knife with the protective guard was defective because it lacked an adequate warning at the time it left Heritage's control and prior to its integration into the assembled Harris press with the Goss C700 cutter and folder.

■■■ Heritage additionally argues that the danger was open and obvious thereby eliminating any duty to warn. Under Massachusetts law, there is no duty to warn of an obvious danger. *Colter v. Barber–Greene Co.*, 525 N.E.2d at 1312. A manufacturer therefore has no duty to warn "[w]here the danger presented by a given product is obvious" inasmuch as "a warning will not reduce the likelihood of injury." *Colter v. Barber–Greene Co.*, 525 N.E.2d at 1312.

In making this argument, however, Heritage points to the knife as the defective product. In so doing, Heritage misinterprets the thrust of Coons' theories of relief which focus on the defective guard as opposed to the knife itself. The knife itself presents an obvious danger. *See Laaperi v. Sears Roebuck & Co., Inc.*, 787 F.2d 726, 730 (1st Cir.1986) ("[w]here the risks of the product are discernible by casual inspection, such as the danger that a knife can cut," no warning is required). The

latent defect in Heritage's product at the time it left its control, however, was not the obvious and inherently dangerous C700 knife. Instead, it was the functional limitations of the protective guard which, in reality, was not a guard but merely a protective cover for shipping purposes.

■■■ Heritage's contention that Coons himself acknowledged the dangerous propensities of knives also fails to warrant summary judgment. It is true that there is no duty to warn "where the plaintiff appreciated the danger substantially to the same extent as a warning would have provided." *Carey v. Lynn Ladder and Scaffolding Co., Inc.*, 427 Mass. 1003, 691 N.E.2d 223, 224 (1998). Although Coons undoubtedly appreciated the danger posed by the C700 knife, he did not necessarily appreciate the danger posed by the guard which reasonably appeared to be a guard as opposed to a report holder meant to protect the blade during shipping. For purposes of summary judgment, the guard's functional limitations were neither obvious nor known to the user.

As a final argument, Heritage, like Chapman, argues that the children's loss of parental consortium claims fail. For previously stated reasons, Heritage is correct and these claims are subject to dismissal.

## III. INDUSTRIAL KNIFE COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 66)

Industrial first moves for summary judgment on the negligence claim in the amended complaint on the basis that it did not breach a duty owed to Coons. Industrial assumes that it owes a duty to Coons but then argues that it acted as a middle man supplier of the C700 knife and guard and neither knew nor should have known of any defect in the knife or sheath. In-

dustrial additionally maintains that it did not proximately cause Coons' injuries inasmuch as the injuries resulted from Coons' slipping on the blade and momentarily losing his balance.

Turning to the first argument, to succeed on the negligence claim Coons must show that the protective guard "was defective" and that Industrial "knew or reasonably should have known of the defect." *Pellegatti v. Pellegatti,* 345 Mass. 591, 188 N.E.2d 579, 581 (1963) (to prevail on negligence claim the plaintiffs "must show that the tire was defective and that the defendant knew or reasonably should have known of the defect"); *accord Enrich v. Windmere Corporation,* 416 Mass. 83, 616 N.E.2d 1081, 1084 (1993) ("seller of a product manufactured by another party is not liable in an action for negligence, unless it knew or had reason to know of the dangerous condition that caused the accident"); *Shuras v. Integrated Project Services, Inc.,* 190 F.Supp.2d 194, 200 (D.Mass.2002) (in negligence or warranty action, seller of product "is liable if it knew or had reason to know of the dangerous condition that caused [the plaintiff's] injury"); *see also Johnson v. Brown & Williamson Tobacco Corp.,* 122 F.Supp.2d 194, 201 (D.Mass. 2000) ("manufacturer has a duty to exercise reasonable care to prevent injury to foreseeable users of a product that it knows or should know is dangerous").

■ Focusing on Industrial's conduct, *see Colter v. Barber–Greene Co.,* 525 N.E.2d at 1313 ("focus of the negligence inquiry is on the conduct of the defendant"), a reasonable jury could find that Industrial "failed to use reasonable care to eliminate" the foreseeable danger to the user during the knife changing process which would subject that user to "an unreasonable risk of injury." *Id.* at 1313. Viewing the record in Coons' favor, Industrial took an active role in the decision to use the guard and, after Heritage located the guard, Industrial approved the chosen guard. Viewing the record in Coons' favor, Industrial knew the guard was only a shipping cover that was not designed to protect the user during the foreseeable knife changing process. Whether viewed as a defect in the design of a shipping cover that appears to the user as a protective guard or the failure to warn the user that the cover does not protect the user, a reasonable jury could find that Industrial knew or reasonably should have known of the foreseeable danger that users would perceive the cover as a protective guard during the knife changing process.

Industrial's proximate cause argument relies on the fact that Coons slipped and lost his balance thereby causing the injuries. Although the summary judgment record *fully* supports this finding, Coons' negligence does not necessarily foreclose Industrial's negligence liability. Industrial remains liable unless Coons was more than 50% at fault. In other words, "The plaintiff's conduct is not viewed as the sole proximate cause of the injury and does not bar recovery completely unless the plaintiff is more than fifty per cent responsible for his or her own injuries." *Id.* at 1314. Here, a reasonable jury could find in Coons' favor and find him 50% or less at fault.

Industrial next moves for summary judgment on the breach of warranty and strict liability counts in the amended complaint. Industrial maintains that to prevail on a design defect claim, as opposed to a failure to warn claim, "Massachusetts law requires that a plaintiff show that the manufacturer has violated its duty to design its products 'so that they are reasonably fit for the purposes for which they are intended.'" (Docket Entry # 67, p. 7, emphasis omitted and quoting *Smith v. Ariens Co.,* 375 Mass. 620, 377 N.E.2d 954, 957 (1978)). Industrial therefore seeks

summary judgment on the design defect claim because "it is not a manufacturer." (Docket Entry # 67, p. 7).

The argument, as framed, is not well taken. First, the only case Industrial cites for the principle that a design defect case in Massachusetts is limited to a manufacturer is *Ariens*. The decision and holding in *Ariens*, however, did not turn upon the distinction between a seller or retailer and a manufacturer. Rather, the only remaining defendant in *Ariens* was the alleged manufacturer. *See Smith v. Ariens Co.*, 377 N.E.2d at 955 & n. 1.

 Second, the relevant count in the amended complaint, although misleadingly captioned as one for "strict liability," alleges liability based upon the allegation that Industrial "breached express and implied warranties of merchantability and fitness for intended use." (Docket Entry # 50, p. 15, ¶ 5). The count therefore encompasses three causes of action, to wit, breach of the warranty of merchantability, breach of the warranty of fitness for a particular purpose and breach of an express warranty. *See* Mass. Gen. L. ch. 106, § 2–314 ("section 2–314") (merchantability); Mass. Gen. L. ch. 106, § 2–315 (fitness for particular purpose); Mass. Gen. L. ch. 106, § 2–313 (express). With respect to the implied warranties in sections 2–314 through 2–318, the Massachusetts Supreme Judicial Court ("SJC") "has noted that these provisions are congruent, in all material respects, with the principles expressed in *Restatement (Second) of Torts* § 402A

(1965), the Restatement's definition of a *seller's* strict liability for harm suffered by a user or consumer of a *seller's* product." *Colter v. Barber–Greene Co.*, 525 N.E.2d at 1313 (emphasis added); *accord Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 446 N.E.2d 1033, 1039 (1983) (noting congruency with *Restatement (Second) of Torts* § 402A (1965), "which defines the strict liability of a *seller* for physical harm to a user or consumer of the *seller's* product") (emphasis added). As expressed in dicta more recently by the SJC, the relevant inquiry in a design defect case "focuses on the product's features, not the *seller's* conduct." *Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 847 N.E.2d 315, 322 (2006) (emphasis added); *see also* Mass. Gen. L. ch. 106, § 2–314(1) (warranty applies if "seller is a merchant with respect to goods of that kind").[9] Viewing the record in Coons' favor, Industrial took an active role in the design of the guard by initiating the requirement for a guard and approving the final product even though it "does not, and never has, manufactured any knives" (Docket Entry # 68, ¶ 5). This court therefore rejects the argument at this time.[10]

Industrial's argument that the danger was an open and obvious risk to the user fails for the reasons articulated *supra* with respect to the similar argument made by Heritage. Coons' experience, while relevant, *Belanger v. Safeskin Corp.*, 2005 WL 2542936 at * 3 (Mass.Super. Sept.6, 2005), does not mandate summary judgment in

---

9. Although Industrial "does not, and never has, manufactured any knives" (Docket Entry # 68, ¶ 4), the implied warranty of merchantability adheres to "the seller" if it "is a merchant with respect to goods of that kind." Mass. Gen. L. ch. 106, § 2–314(1). Industrial does not argue that it is not a "merchant with respect to goods of that kind." Rather, it argues that it is not a manufacturer. Accordingly, this court is not faced with that issue at this time.

10. Because of the scarcity of legal authority cited by Industrial as well as Coons vis-à-vis this particular argument by Industrial, Industrial is not foreclosed from bringing additional authority to the attention of this court at a later point in time and raising the argument a second time, albeit at trial inasmuch as the deadline for dispositive motions has passed.

Industrial's favor. For purposes of summary judgment, a reasonable jury could find that the functional limitations and risks posed by the guard were not open and obvious to the user.

Industrial's final argument with respect to the strict liability count fails for reasons more fully articulated in Coons' brief. (Docket Entry # 73, ¶ V). Industrial misperceives the theory of liability in the strict liability count (Count VI). Count VI is grounded upon a defect in the guard's design or a failure to warn as to this product.[11] As such, Count VI does not, as argued by Industrial, present a theory of strict liability for an ultrahazardous activity. The SJC narrowly interprets that strict liability doctrine as applying "only where there is an 'escape' of an abnormally dangerous activity onto the property of another." *Thomalen v. Marriott Corp.*, 880 F.Supp. 74, 75 (D.Mass.1995) (citing *Clark–Aiken Co. v. Cromwell–Wright Co., Inc.*, 367 Mass. 70, 323 N.E.2d 876, 881 & n. 7 (1975)). Count VI, although misleadingly captioned "Strict Liability," is not grounded upon the ultrahazardous activity doctrine and therefore does not mandate the showing of an escape of an abnormally dangerous activity onto another's property. Coons also correctly points out that Massachusetts warranty law is congruent with strict liability principles in *Restatement (Second) of Torts* § 402A (1965). *See Colter v. Barber–Greene Co.*, 525 N.E.2d at 1313; *accord Correia v. Firestone Tire & Rubber Co.*, 446 N.E.2d at 1039.

As a final matter, Industrial moves for summary judgment on the six indemnity counts in Chapman's third party complaint.[12] Count II of the third party complaint seeks indemnity based upon an express or implied agreement obligating Industrial to indemnify Chapman. An express agreement undoubtedly "may create a right to indemnification." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Authority*, 693 F.2d 1, 2 (1st Cir.1982). Pointing to the absence of evidence to support liability for indemnity based upon an express agreement, Chapman fails to respond with evidence of the existence of such an agreement. Count II, to the extent it seeks indemnity upon an "express agreement" (Docket Entry # 30, Count II, ¶ 12), is therefore subject to summary judgment. *See, e.g., United States v. Dynamics Research Corp.*, 2006 WL 2007649 at * 7 (D.Mass. July 17, 2006) (express agreement to create right to indemnity "is clearly inapplicable here as neither party contends that an express agreement regarding indemnification existed").

■ "A contractual right to indemnity arises from the relationship between the parties." *Fall River Housing Auth. v. H.V. Collins Co.*, 414 Mass. 10, 604 N.E.2d 1310, 1313 (1992). An implied right to contractual indemnity therefore exists "only when there are 'special factors' surrounding the contractual relationship which indicate an intention by one party to indemnify another in a particular situation." *Id.* (collecting examples); *accord*

---

**11.** This court expresses no opinion on the duplicative nature of the design defect and failure to warn theories posited in the strict liability count (Count VI) with the breach of warranty theories posited in Count V. *See Haglund v. Philip Morris, Inc.*, 847 N.E.2d at 321–322 (noting, in context of discussing implied breach of warranty of merchantability, that "warranty liability may be premised ei-

ther on the failure to warn (citation omitted), or, as here, on defective design").

**12.** Count I is based upon statutory contribution under Massachusetts General Laws chapter 231B. Industrial's arguments seek summary judgment on the indemnity counts and fail to mention, let alone argue, the issue of contribution. Count I is therefore not subject to summary judgment.

*Samos Imex Corp. v. Nextel Communications, Inc.*, 20 F.Supp.2d 248, 250 (D.Mass. 1998) (implied right to indemnification occurs "if 'special factors' exist to support intention that one party indemnify the other" resulting "from the contract provisions as viewed against the relationship between the parties").

This theory of an implied right to indemnity implicates Count IV, which seeks indemnity on the basis of Industrial's "special relationship with A.F. Chapman" (Docket Entry # 30, ¶ 16), and Count III, which seeks to impose an indemnity obligation because of the parties' more specific "business *relationship* as designer, manufacturer, distributor and/or supplier" (Docket Entry # 30, ¶ 14; emphasis added).

■ As to the existence of a special relationship, Chapman neither identifies nor suggests the presence of a special relationship between Industrial and Chapman. *See, e.g., Medeiros v. Whitcraft*, 931 F.Supp. 68, 75 (D.Mass.1996) (allowing summary judgment on indemnity inasmuch as the party seeking indemnity "neither alleged any facts, nor offered any evidence, to even suggest ... that any 'special relationship' exists between the parties"). Rather, Chapman argues the existence of a great disparity in the fault of Industrial versus the allegedly blameless conduct and non-involvement on the part of Chapman. Furthermore, the case law does not support the existence of such a relationship under the circumstances. *See, e.g., Oates v. Diamond Shamrock Corp.*, 23 Mass.App.Ct. 446, 503 N.E.2d 58, 59–60 (1987) (defendant retailer not entitled to indemnification from co-defendant manufacturer inasmuch as there is no special relationship between the parties); *Myrtle Beach Pipeline Corp. v. Emerson Electric Co.*, 843 F.Supp. 1027, 1064 (D.S.C.1993) ("courts have uniformly held that this vendor-vendee relationship does

not constitute a 'special' or 'unique' circumstance justifying implied contractual indemnity"). Summary judgment on counts III and IV is therefore warranted.

Turning to the remaining basis for indemnity liability in Count II, i.e., "an implied ... agreement" to indemnify (Docket Entry # 30, ¶ 12), it is also unavailing. Simply put, an implied agreement to indemnify based upon unique special factors does not exist. "The majority rule is that a sales agreement alone is not a sufficient basis on which to imply a contractual obligation on the part of a buyer to indemnify a seller for damages paid to an injured employee of the buyer." *Decker v. Black and Decker Manufacturing Company*, 389 Mass. 35, 449 N.E.2d 641, 643 (1983); *accord Tata v. American Linen Supply Co., Inc.*, 2002 WL 31973230 at * 2 (Mass.Super. Nov.7, 2002) (same).

■ Absent an express or implied contractual basis for indemnity, indemnity is also permissible "where the person seeking indemnification did not join in the negligent act of another but was exposed to liability because of that negligent act." *Rathbun v. Western Massachusetts Electric Co.*, 395 Mass. 361, 479 N.E.2d 1383, 1385 (1985); *accord Samos Imex Corp. v. Nextel Communications, Inc.*, 20 F.Supp.2d at 251 (same). The "general rule," however, "is that a person who negligently causes injury to a third person is not entitled to indemnification from another person who also negligently caused that injury." *Rathbun v. Western Massachusetts Electric Co.*, 479 N.E.2d at 1385. Thus, only under "exceptional circumstances ... has indemnity been allowed to one who was not free from fault." *Id.*

■ Count VI implicates the foregoing form of indemnity. It alleges that, if Chapman is held negligent, "its negligence is derived solely or substantially from the negligence of Industrial" and, "pursuant to

common law principles," Industrial "is required" to indemnify Chapman. (Docket Entry # 30, ¶ 20). In seeking summary judgment on the indemnification claims, Industrial argues that it "was in no way at fault for Coons' injuries." (Docket Entry # 67, p. 10). Chapman, in turn, points to facts that show that Industrial drop shipped the boxes with the knives and guards directly to Retail and that Chapman was not involved in the manufacture or design of the guards or the decision to place the guards on the C700 knives. As previously explained, Industrial is not necessarily free of fault. Summary judgment on the indemnity claim in Count VI is therefore improper.

Count V sets forth the remaining claim for indemnity in the third party complaint. Therein, Chapman purports to impose an indemnity obligation upon Industrial "because of its role as designer, manufacturer, distributor and/or supplier of the defective product in question, [it] is obligated pursuant to the Uniform Commercial Code and principles of product liability law, to defend, indemnify, hold harmless and reimburse A.F. Chapman." (Docket Entry # 30, ¶ 18). Neither party discusses the interplay between indemnity, product liability law and the Uniform Commercial Code or otherwise addresses the merits of the theory of indemnity posited in this count.

▇▇ As codified in Massachusetts, the Uniform Commercial Code ("UCC") "leaves to other laws the allocation of liability for noncommercial harms." *National Union Fire Insurance v. Allite, Inc.*, 430 Mass. 828, 724 N.E.2d 677, 683 (2000) (citing Massachusetts General Laws ch. 106, § 1–103, as precluding indemnity for tort under Article 7). Where, as here, the action upon which indemnity is sought involves personal injuries grounded upon negligence, indemnity does not conflict with the warranty provisions of the UCC which "provide a comprehensive scheme of remedies for economic loss." *Blommer Chocolate Co. v. Bongards Creameries, Inc.*, 635 F.Supp. 919, 931 (N.D.Ill.1986). Conversely, the UCC therefore does not obligate Industrial to indemnify Chapman for Coons' personal injuries.

▇▇ Chapman's entitlement to indemnity fairs better under "principles of product liability," even though Chapman fails to identify such principles. In Massachusetts, as elsewhere, " '[i]f a manufacturer supplies a defective product to a retailer, who sells it to a customer, who recovers from the retailer for an injury incurred, the retailer may recover in indemnity against the manufacturer or [she or] he may maintain an action in negligence....' " *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 479 N.E.2d at 1389 (quoting *Restatement (Second) of Torts* § 886B, cmt. c (1979)); *see also* Dragan M. Cetkovic *Loss Shifting: Upstream Common Law Indemnity in Products Liability*, 61 Defense Counsel Journal 75, 85 (1994). Count V appears similar to the basis of common law indemnity liability alleged in Count VI which, as previously explained, is not subject to summary judgment. Viewing the record in Chapman's favor, a reasonable jury could find that Industrial supplied the defective guard and that Chapman was not at fault. Summary judgment on Count V is therefore inappropriate.

As a final matter, the deadline for joining additional parties has expired. Coons has failed to identify "Defendant John Doe" other than describing John Doe as a distributor or retailer of commercial printing equipment. Coons is therefore ordered to identify this defendant within ten days of the date of this Order.

### CONCLUSION

In accordance with the foregoing discussion, Chapman's and Heritage's motions

for summary judgment (Docket Entry # # 60 & 63) are **DENIED** except for the loss of parental consortium claims brought by Peter and Nevaeh Coons. Industrial's summary judgment motion (Docket Entry # 66) is **ALLOWED** as to counts II, III and IV of the third party complaint filed by Chapman and otherwise **DENIED.**

Inasmuch as the deadline for filing dispositive motions has passed and there shall be no extensions of this deadline, the parties are ordered to appear for a status conference on November 7, 2006, at 10:00 a.m. to set a date for trial.