PAUL COUGHLIN, administrator,[1] vs. TITUS & BEAN GRAPHICS, INC.

No. 99-P-117.

Plymouth. February 5, 2001. - May 3, 2002.

Present: PERRETTA, SMITH, & LENK, JJ.

*Negligence,* Wrongful death, Employer, Retention of employee. *Wrongful Death. Damages,* Wrongful death, Punitive. *Practice, Civil,* Summary judgment.

In an action alleging wrongful death of a decedent based on an employer's·allegedly negligent hiring and supervision of an employee with a criminal record, the judge did not err in granting summary judgment in favor of the employer based on the conclusion that, as matter of law, the employer owed no duty of care to the decedent, where the decedent was not a customer, employee, or business invitee of the decedent at the time she was murdered; where the employee did not commit the murder while at work; and where, even if the employer had conducted a background check on the employee, it could not have reasonably foreseen that the employee, who worked alone at a warehouse and was not expected to have regular contact with the public in the normal course of business, posed a threat to members of the public, including the victim. [638-641]

In a wrongful death action seeking punitive damages based on the defendant's gross negligence or malicious, wilful, wanton, or reckless conduct, a Superior Court judge properly granted summary judgment in favor of the defendant, where the evidence was insufficient to support a claim of even ordinary negligence. [641]

CIVIL ACTION commenced in the Superior Court Department on March 24, 1995.

The case was heard by *Barbara A. Dortch-Okara,* J., on a motion for summary judgment.

*Rachel H. Prindle* for the plaintiff.

*Peter E. Heppner* for the defendant.

SMITH, J. The plaintiff, Paul Coughlin, administrator of the

---

[1] Of the estate of Colleen Coughlin.

estate of his daughter, Colleen Coughlin (victim), brought an action in the Superior Court against the defendant, Titus & Bean Graphics, Inc., doing business as Speedy Sign A Rama, USA (Titus & Bean). The complaint set forth several counts alleging wrongful death of the victim based on the defendant's negligent hiring and negligent supervision of its employee, Michael Kelley.[2]

On March 23, 1998, the defendant filed a motion for summary judgment. The plaintiff opposed the motion, and filed a statement of material facts, accompanied by forty-two exhibits.[3]

On June 24, 1998, a Superior Court judge allowed the defendant's motion for summary judgment, ruling, as matter of law, that Titus & Bean did not owe any duty to the victim. On appeal, the plaintiff challenges the judge's allowance of the defendant's summary judgment motion.

In ruling on a motion for summary judgment, "a judge . . . must consider 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' in determining whether summary judgment is appropriate. Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The burden on the moving party is to 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' *Id.*" *Madsen* v. *Erwin*, 395 Mass. 715, 719 (1985). "This burden need not be met by affirmative evidence negating an essential element of the plaintiff's case, but may be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial." *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991). See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 708-716 (1991).

---

[2]The plaintiff also asserted counts of negligent security and public nuisance. Both of these counts were dismissed by agreement of the parties.

[3]Titus & Bean filed a motion to strike certain affidavits, deposition testimony, and other exhibits filed in support of the plaintiff's motion. It claimed that the materials referred to events that occurred after the murder of the victim and, therefore, were not relevant. It also moved to strike certain statements of Harold Titus at his deposition and certain statements contained in other depositions and materials. It claimed the statements would not be admissible at trial and, therefore, should not be considered by the motion judge. See *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985). The motion judge did not rule on the motion. We do not rely on the challenged material in making our decision.

In reviewing the grant of summary judgment in favor of the defendant, we assume the truth of the facts set forth in the plaintiff's materials submitted to the motion judge in opposition to the defendant's motion for summary judgment. *Copithorne* v. *Framingham Union Hosp.*, 401 Mass. 860, 861 (1988).

A. *Facts.* The undisputed record before the motion judge, viewed in the light most favorable to the plaintiff, establishes the following material facts.

Titus & Bean is a small company engaged in the business of manufacturing signs. During the period in question, Harold Titus was the president of the company and handled all managerial aspects of the company. Douglas Bean, the vice-president, was in charge of the actual production of the signs.

Titus & Bean's operations were based at 150 Summer Street in Kingston. In August of 1991, Titus & Bean purchased some screen printing equipment from another sign company that had gone out of business. As part of the purchase arrangement, Titus & Bean was allowed to leave the equipment at the premises of that company, and to use the premises for screen printing operations until a paying tenant was found or until Titus & Bean's business grew to the point where it could afford to pay rent. The premises consisted of a warehouse, located at 385R Court Street in Plymouth. On April 13, 1992, Kelley murdered the victim in that warehouse.

The warehouse was located in the rear of an old, brick, boarded-up building and was in close proximity to numerous residences, including that of the victim, which was located about fifty feet from the warehouse. A paved pedestrian easement ran past the entrance to the warehouse. The easement, which was frequently used by pedestrians, ran to a nearby shopping mall.

1. *Kelley's background.* On August 26, 1977, Michael Kelley was convicted of rape and assault and battery upon another by means of a dangerous weapon. He received two concurrent sentences of three to five years, suspended, and probation for four years. On December 7, 1977, Kelley violated the terms of his probation and a warrant was issued for his arrest. On November 6, 1978, Kelley's probation was terminated and he

began serving his two previously imposed concurrent sentences of three to five years.

On that same day, Kelley pleaded guilty to two other charges of rape and to one charge of robbery. He received three sentences of twelve to fifteen years to be served concurrently, but from and after the previously imposed from three to five year sentences. Kelley's aggregate sentence was from fifteen to twenty years.

In 1978, Kelley was committed to the Massachusetts Treatment Center for Sexually Dangerous Persons (treatment center) at Bridgewater as a sexually dangerous person. In June of 1991, pursuant to G. L. c. 123A, § 8,[4] a restrictive integration review board (board) was organized and, after hearing evidence, found that Kelley was no longer a sexually dangerous person. The board's findings were presented to the Superior Court as part of a petition for Kelley's release. See G. L. c. 123A, § 9. After a hearing, a Superior Court judge determined that Kelley was no longer a sexually dangerous person and ordered his release from the treatment center. Kelley was then held in a correctional facility until the Massachusetts Parole Board approved his release on parole on September 30, 1991.[5]

2. *Kelley's employment with Titus & Bean.* While at the treatment center, Kelley was allowed to participate in a work release program. He was employed for two and one-half years by National Real Estate Sign Company (National). National knew that Kelley had committed some violent crimes against women, including rape, and had been committed to the treatment center as a sex offender. During the course of his employment, Kelley

---

[4]Effective April 14, 1994, this section was repealed by St. 1993, c. 489, § 5.

[5]As a result of Kelley's release on parole, and the subsequent murder of the victim, the plaintiff brought an action in the Superior Court setting forth wrongful death and Federal civil rights claims against the Department of Correction and other State agencies and employees. A Superior Court judge dismissed the action.

In that appeal, we held that the plaintiff's complaint failed to state a claim for relief under 42 U.S.C. § 1983, but reversed the dismissal as to the counts alleging wrongful death. See *Coughlin* v. *Department of Correction*, 43 Mass. App. Ct. 809, 810-817 (1997).

On April 9, 1998, a stipulation of dismissal was filed in the case and a judgment of dismissal was entered at the plaintiff's request.

had daily contact with other employees, customers, and clients, many of whom were women. After his release from the treatment center, Kelley stopped working for National because the correctional facility where he was subsequently incarcerated did not have a work release program.

In October of 1991, Kelley was paroled. He went back to work at National on a contract basis. While delivering signs to Titus & Bean, Kelley asked for a job as a silk screener. Titus & Bean could not afford to hire Kelley but did so when it learned that a tax credit was available through the targeted jobs tax credit program of the Department of Employment and Training for employers who hired persons released from prison.

At the time Titus & Bean hired Kelley, it knew that he had been in prison for fourteen years after committing a violent crime. When asked by Titus & Bean the nature of the crime he had committed that resulted in his incarceration, Kelley responded that "he was with a friend and a girl, there was an accident, police showed up. He got in a fight with one police [officer] and broke the ribs, nose and cheek of a female cop, and bit the throat of another cop." Kelley did not inform Titus & Bean that he was on parole but, rather, said that "he was in prison and had done his time and he was out."

Titus & Bean did not, before hiring Kelley or during his employment with it, contact the Massachusetts Department of Correction, the Massachusetts Parole Board, any local police department, or the Massachusetts State police regarding Kelley's criminal background. Further, Titus & Bean did not ask National for a reference.

3. *The murder.* On April 9, 1992, Kelley began working for Titus & Bean on a trial basis at the warehouse. He was the only person working at that location. Kelley had his own set of keys, although it is unclear how Kelley obtained those keys.[6]

On April 13, 1992, at approximately 2:30 P.M., Kelley was sitting on granite steps on the sidewalk adjacent to the warehouse. That day, he was to start work at 6:30 P.M. and work

---

[6]In his confession to the murder, Kelley merely stated that he had keys to the building. Both Titus and Bean deny giving keys to the warehouse location to Kelley. However, it is undisputed that on the day of the murder, Kelley had in his possession keys to the warehouse.

through 9:30 P.M. The victim walked down the steps and a conversation about the sign shop ensued. Kelley invited the victim into the warehouse to see the printing operation. Once inside the building, Kelley murdered the victim. He wrapped her body in plastic bags and left the location with the body. He buried the victim's body in a shallow grave near his home. Kelley then returned to the warehouse to begin his shift at 6:30 P.M. Unaware of the murder, Titus & Bean allowed Kelley to officially commence employment on April 14, 1992.

On June 13, 1992, Kelley began a series of confessions implicating himself in the victim's murder. He subsequently pleaded guilty to first degree murder and was sentenced to life imprisonment.

B. *Analysis*. 1. *Summary judgment on negligence claims*. Ordinarily, summary judgment is not an appropriate means of resolving negligence cases because, usually, the question of negligence is one of fact. *Roderick* v. *Brandy Hill Co.*, 36 Mass. App. Ct. 948, 949 (1994), citing *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983). A judge, however, "may decide the issue as matter of law when no rational view of the evidence permits a finding of negligence." *Roderick* v. *Brandy Hill Co.*, 36 Mass. App. Ct. at 949.

Under Massachusetts law, to prove a cause of action founded upon negligence, the plaintiff must satisfy the elements of duty, breach, causation, and damages. See *Bacon* v. *Federal Kemper Life Assur. Co.*, 400 Mass. 850, 853 (1987). As such, a person is not negligent toward another unless he owes the other a duty to be careful. *Theriault* v. *Pierce*, 307 Mass. 532, 533 (1940). *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. 624, 629 (1989) ("There can be negligence only where there is a duty to be careful"). Whether a person owes such a duty is a question of law. *Schofield* v. *Merrill*, 386 Mass. 244, 248-249 (1982). Here, the motion judge ruled as matter of law that the defendant did not owe any such duty to the victim.

The plaintiff argues that our decision in *Foster* v. *The Loft, Inc.*, 26 Mass. App. Ct. 289, 290-291 (1988), controls this matter because in that case, we held that an employer, whose employees are brought in contact with members of the public in the course of the employer's business, has a duty to exercise

reasonable care in the selection and retention of those employees.[7]

We disagree. Here, the victim was neither a customer of Titus & Bean, nor an employee or business invitee at the time she was murdered. Furthermore, at the time that Kelly committed the murder, he had not started to work that day.

Our analysis does not stop here. A special relationship between the parties may give rise to a common-law duty. See *Whittaker* v. *Saraceno*, 418 Mass. 196, 198 (1994). The most important consideration in determining whether a special relationship exists between a plaintiff and a defendant is whether the "defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." *Irwin* v. *Ware*, 392 Mass. 745, 756 (1984). See *Addis* v. *Steele*, 38 Mass. App. Ct. 433, 437 (1995). Reasonable foreseeability that a third party will cause harm to the plaintiff is determined by examining all of the circumstances. *Whittaker* v. *Saraceno*, 418 Mass. at 199. Here, the motion judge ruled that Titus & Bean did not have a duty to perform a background check on Kelley's prior criminal acts because it was not reasonably foreseeable that he would attack a member of the public.

The plaintiff's materials before the motion judge show that at the time Titus & Bean hired Kelley, it knew that he had spent fourteen years in prison for a violent crime, including a crime against women. The fact that Kelley had a criminal record, by itself, is not enough to establish, as matter of law, Titus & Bean's negligence. See *Foster* v. *The Loft, Inc.*, 26 Mass. App.

---

[7]In *Foster* v. *The Loft, Inc.*, the plaintiff, who had been a bar customer, brought an action against the bar owner and a bartender arising from an assault and battery inflicted on him by the bartender. The jury, in an answer to a special question, found that the bar owner failed to use reasonable care in deciding to retain the bartender as an employee.

We held that the jury's findings were warranted by evidence that, prior to the incident, the employer knew that the bartender had been convicted of violent crimes; that the establishment "was not a quiet cocktail lounge but rather a large complex of bars that served alcoholic beverages to a large, young crowd"; and that the bartender's duties, which included "the handling of customer complaints, presented situations that . . . might deteriorate into heated confrontations." 26 Mass. App. Ct. at 294.

Ct. at 294.[8] Moreover, if Titus & Bean had conducted a background check in April of 1992, it would have discovered that Kelley's October, 1991, release on parole was based, in large part, on professional evaluations by Kelley's doctors at the treatment center and their subsequent recommendation to the parole board that Kelly be released.[9] Although Titus & Bean could make no predictions as to the future, it would not have been unreasonable for Titus & Bean to rely on the judgment of those professionals who had the most knowledge of Kelley's recent behavior.[10] In sum, a background check would not have provided any additional information that would have enabled Titus & Bean to reasonably foresee that Kelley posed a threat to members of the public at or near 385R Court Street. In any event, Kelley was to work alone at the warehouse and was not

[8]"For us to hold that an employer can never hire a person with a criminal record or retain such a person as its employee 'at the risk of being held liable for his tortious assault flies in the face of the premise that society must make a reasonable effort to rehabilitate those who have gone astray.' *Williams* v. *Feather Sound, Inc.*, 386 So. 2d 1238, 1241 (Fla. Dist. Ct. App. 1980)." *Foster* v. *The Loft, Inc.*, 26 Mass. App. Ct. at 294 n.6.

[9]The reasons for a parole board's decision to release a prisoner on parole is a public record. See G. L. c. 127, § 130.

The parole board gave the following reasons for its decision to release Kelley on parole. "Michael Kelley is serving an aggregate 15 to 20 year sentence for multiple counts of rape. He was committed to the treatment center in 1979 as a Sexually Dangerous Person (SDP). He was discharged from this civil commitment in June, 1991. During his 12 years in treatment he progressed to an extraordinary degree, to the extent that he served much of his time in a community release program. He committed himself to recovery and based upon staff reports and reports of his behavior during this incarceration has attained a degree of rehabilitation which the panel has rarely seen. The Board firmly believes that Mr. Kelly is now a good risk for supervised release via parole. He has excellent family, community and therapeutic supports available to him and further incarceration would be detrimental to him and would not benefit the community."

[10]"A layperson, acting reasonably, need not anticipate danger from a person who has been released on probation or parole from a penal institution. The very fact of being placed on probation or parole imports a professional judgment by trained penal and medical personnel that the probationer or parolee does not represent a risk to society outside prison walls. In the absence of specific events . . . it is hardly reasonable to expect a social host to anticipate perils that responsible State institutions and qualified personnel have not anticipated." *Apple* v. *Tracy*, 34 Mass. App. Ct. 560, 562 (1993). Although *Apple* concerns a social host, we hold that its reasoning applies to employers also.

expected to have regular contact with the public in the normal course of business. Thus, in those circumstances, Titus & Bean could not have reasonably foreseen that Kelley posed a threat to members of the public, including the victim.

The murder of the victim was a terrible tragedy. However, "[t]here must be limits to the scope or definition of reasonable foreseeability based on considerations of policy and pragmatic judgment." *Griffiths* v. *Campbell*, 425 Mass. 31, 35-36 (1997), quoting from *Poskus* v. *Lombardo's of Randolph, Inc.*, 423 Mass. 637, 640 (1996). As matter of law, Titus & Bean owed the victim no legal duty. Therefore, the motion judge did not commit error in granting Titus & Bean's motion for summary judgment.

2. *Summary judgment on punitive damages claim.* It was also proper to grant summary judgment on the plaintiff's punitive damages claim. The wrongful death statute allows for punitive damages in cases where a "decedent's death was caused by the malicious, wilful, wanton, or reckless conduct of the defendant or by the gross negligence of the defendant." G. L. c. 229, § 2. The "malicious, wilful, wanton, or reckless" and "gross negligence" standards are appreciably higher than the standards for ordinary negligence. See *DiGloria* v. *Chief of Police of Methuen*, 8 Mass. App. Ct. 506, 513 (1979); *Davis* v. *Walent*, 16 Mass. App. Ct. 83, 92 (1983). Since the evidence was insufficient to support the ordinary negligence claims, it follows that the evidence cannot support the claim for punitive damages because more than ordinary negligence is required. Accordingly, the motion judge did not err when she granted summary judgment on the plaintiff's claim for punitive damages.

*Judgment affirmed.*